## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| DEREK CARDER, an individual, MARK BOLLETER, an individual, DREW DAUGHERTY, an individual, and ANDREW KISSINGER, an individual, on behalf of themselves and all others similarly situated, | § § § § § § | Civil Action No.: 4:09-cv-03173<br><br>CLASS ACTION |
| Plaintiffs, | § § § § | FIRST AMENDED COMPLAINT |
| v. | § § | |
| CONTINENTAL AIRLINES, INC. a Delaware Corporation; and DOES 1 through 100, inclusive, | § § § | |
| Defendants. | § § § § § | DEMAND FOR JURY TRIAL |

---

### PLAINTIFFS' FIRST AMENDED COMPLAINT

Plaintiffs, Derek Carder, Mark Bolleter, Drew Daugherty and Andrew Kissinger ("Plaintiffs"), on behalf of themselves and a class of all similarly situated persons, by the undersigned attorneys, hereby file this First Amended Class Action Complaint against Defendant Continental Airlines, Inc. ("Continental") and Does 1 through 100, inclusive, and each of them, based upon documentary evidence, the investigation of attorneys, interviews of potential witnesses and persons knowledgeable of these events and allege as follows:

## I.

### NATURE OF ACTION

1.     This is a civil class action brought pursuant to the Uniformed Services Employment and Reemployment Rights Act of 1994, 38 U.S.C. §§ 4301 et. seq. ("USERRA"). It is brought by Plaintiffs on behalf of a nationwide Class of all persons similarly situated, including current and former employees of Continental, who were or are currently serving in the United States Armed Services or National Guard.

## II.

## <u>JURISDICTION AND VENUE</u>

2.      This Court has jurisdiction over the subject matter of this action pursuant to 38 U.S.C. § 4323(b).

3.      Venue is proper in this district under 38 U.S.C. § 4323(c)(2) and 28 U.S.C. § 1391(b), because Defendant Continental maintains a place of business in Houston, Harris County, Texas.

## III.

## <u>PARTIES</u>

4.      Plaintiff Derek Carder ("Carder") is an individual who is residing in the City of Allen, County of Collin, State of Texas.  He is currently employed by Continental Airlines as a pilot.  Carder is also a Lieutenant Commander in the Unites States Naval Reserve.

5.      Plaintiff Mark Bolleter ("Bolleter") is an individual who is residing in the City of Montgomery, County of Montgomery, State of Texas.  He is currently employed by Continental Airlines as a pilot.  Bolleter retired as a Major from the Louisiana Air National Guard in or around June 2007.

6.      Plaintiff Drew Daugherty ("Daugherty") is an individual who is residing in the City of Austin, County of Hays, State of Texas.  He is currently employed by Continental Airlines as a pilot.  Daugherty is also currently a Lieutenant Colonel in the Texas Air National Guard.

7.      Plaintiff Andrew Kissinger ("Kissinger") is an individual who is residing in the City of Schertz, County of Guadalupe, State of Texas.  He believes and alleges that he was not hired by Continental due to his involvement with the U.S. Air Force Reserves.  Kissinger is currently employed by another major air carrier and is also a Lieutenant Colonel in the U.S. Air Force Reserves.

8.      Defendant Continental is an air carrier engaged in the business of transporting passengers nationally and internationally.  Plaintiffs are informed and believe, and thereon allege, that Continental is a company organized under the laws of Delaware, and which has its principal place of business located at 1600 Smith Street, Houston, Harris County, Texas 77002.

1

9.      Plaintiffs are informed and believe and thereon allege that at all times herein mentioned, Defendants Does 1 through 100, inclusive, and each of them, were individuals and/or business entities authorized to and doing business as agents, employees, subcontractors, independent contractors or otherwise on behalf of Defendant Continental and at all relevant times were acting with the authorization and/or ratification of Defendant Continental as aforesaid.

10.     The full extent of the facts linking the fictitiously designated Defendants with each cause of action alleged herein is unknown to Plaintiffs, or the true names or capacities, whether individual, plural, corporate, partnership, associate or otherwise, of Defendants Does 1 through 100, inclusive, and each of them, are unknown to Plaintiffs. Plaintiffs therefore sue said Defendants by such fictitious names. Plaintiffs are informed and believe and thereon allege that each of the Defendants designated herein as a Doe is negligently, recklessly, tortiuously and unlawfully responsible in some manner for the events and happenings herein referred to and negligently, tortiuously, and unlawfully proximately caused the injuries and damages thereby to Plaintiffs as herein alleged. Plaintiffs will hereinafter seek leave of Court to amend this Complaint to show said Defendants' true names and capacities after the same have been ascertained. Plaintiffs are alleging causes of action against each Doe Defendant under every theory of recovery set forth herein.

## IV.
## GENERAL ALLEGATIONS

11.     Continental is a flag air passenger carrier employing more than 5,000 pilots. Plaintiffs are informed and believe that approximately one thousand (1,000) of Continental's pilots are members of the United States Armed Services or National Guard.

12.     Section 4311(a) of USERRA provides:

> A person who is a member of, applies to be a member of, performs, has performed, applies to perform, or has an obligation to perform service in a uniformed service shall not be denied initial employment, reemployment, retention in employment, promotion, or any benefit of employment by an employer on the basis of that membership, application for membership, performance of service, application for service, or obligation.

38 U.S.C. 4311(a).

13.     A "benefit of employment" is defined as:

2

The term 'benefit', 'benefit of employment', or 'rights and benefits' means any advantage, profit, privilege, gain, status, account, or interest (other than wages or salary for work performed) that accrues by reason of an employment contract or agreement or an employer policy, plan, or practice and includes rights and benefits under a pension plan, a health plan, an employee stock ownership plan, insurance coverage and awards, bonuses, severance pay, supplemental unemployment benefits, vacations, and the opportunity to select work hours or location of employment.

38 U.S.C. 4303(2).

14.     Section 4311(c) further provides:

An employer shall be considered to have engaged in actions prohibited:

(1) under subsection (a), if the person's membership, application for membership, service, application for service, or obligation for service in the uniformed services is a motivating factor in the employer's action, unless the employer can prove that the action would have been taken in the absence of such membership, application for membership, service, application for service, or obligation for service.

38 U.S.C. 4311(c).

15.     The pilots and other labor groups at Continental are subject to collective bargaining agreements.  This lawsuit does not contest the interpretation of any collective bargaining agreement and only refers to items that may be covered under collective bargaining agreements in order to provide background and a general understanding of Plaintiffs' allegations.

16.     Pursuant to the Collective Bargaining Agreement (hereinafter the "Collective Bargaining Agreement") between Continental and the Airline Pilots Association ("ALPA") executed on April 1, 2005, Continental utilizes a seniority-based system in which a pilot's seniority date will be the date on which he starts training as a pilot for Continental.

17.     Pilots with more seniority are afforded more benefits of employment as set forth in Section 22, Part 4 of the Collective Bargaining Agreement, which provides:

[S]eniority, in accordance with a pilot's position on the current Continental Pilot System Seniority List, will govern all pilots in case of promotion or demotion to Captain, International Relief Officer, First Officer, or Second Officer, retention in case of reduction in force, assignment or reassignment due to expansion or reduction in flying time, recall after furlough due to reduction in force, monthly Line award, and choice of vacancies.

3

18.     Pilots are hourly employees and paid an exact hourly rate based on their years of service with Continental ("longevity," defined in Section 3, Part 2 of the Collective Bargaining Agreement) and their aircraft type and seat assignment. A table of pay rates is included in Section 3, Part 3 of the Collective Bargaining Agreement.

19.     The definition of longevity and the applicable pay rates are not in dispute and are clearly defined in the Collective Bargaining Agreement.

A.     **Scheduling Practices**

20.     As set forth in the Collective Bargaining Agreement, Continental implemented a preferential bidding system ("PBS") as a scheduling tool for the assignment of trips to be flown by each pilot.

21.     Through the utilization of PBS, Continental allows pilots to bid on flight schedules for the upcoming month based on their seniority status. Those requests are granted according to availability of trips and seniority.

22.     Continental's policies and procedures require pilots to submit military leave prior to the twelfth (12th) of the month preceding the month in which the military leave is actually taken ("early submission of military leave"). This requirement is not set forth in the Collective Bargaining Agreement but rather in separate bulletins issued by Continental to its employees.

23.     Continental uses PBS to incorporate the above mentioned early submission of military leave inputs as restrictions to building trips by blocking off a pilot's availability on those days and giving that pilot a credit of time in the construction of their flight line.

24.     The early submission of military leave is designed to build schedules around military leave thereby forcing pilots to work on days they would otherwise have time off and accept trips that otherwise would be assigned to less senior pilots, in violation of USERRA.

25.     By utilizing the early submission of military leave, Continental treats its employees who have military commitments differently than non-military members and penalizes them for their military duties.

26.     Plaintiffs are not alleging that Defendant Continental has improperly applied and interpreted the Collective Bargaining Agreement's terms and guidelines regarding the utilization of PBS. Rather, Plaintiffs allege that Continental's early submission of military leave procedure, as set forth in bulletins separate and apart from the Collective Bargaining Agreement, is in violation of USERRA because it penalizes employees based on their military commitments.

4

27.     Continental uses PBS to construct trip assignments around each pilot's military leave schedule which not only forces pilots to work on days they would otherwise have off, but also creates schedules for the Class that are far inferior, lower in quality and/or contain fewer hours and thus less pay than their seniority allows them to hold.

28.     Quality in schedules would include, but is not limited to, working or not working during certain days of the week, such as weekends, and time off during holidays.

29.     Evidence of this improper scheduling is obtainable by reviewing the schedules of military and non-military pilots whose seniority is similar.  Interpretation of the Collective Bargaining Agreement is not necessary to support such violations.

30.     The resulting line of trips provided by Continental's scheduling is not in accordance with each pilot's seniority when compared with the line of trips schedule for non-military pilots.

31.     If a pilot does not submit military leave prior to the twelfth (12th) of the preceding month ("short notice military leave"), the pilot receives a normal schedule commensurate with his or her seniority and the pilot is dropped from any affected trip pairing which Continental covers with other available pilots.

**B.     Denial of Employment Benefits Under Defined Contribution Retirement Plan**

32.     Pursuant to Section 28, Part 4, subsection A of the Collective Bargaining Agreement, Continental Airlines maintains a separate pilot-only money purchase, defined contribution pension plan, "covering all pilots, line and management, active, retired and terminated."

33.     Pursuant to Section 28, Part 4, subsection D of the Collective Bargaining Agreement, "A pilot will participate in the B-Plan (and be eligible to receive Company contributions to his B-Plan accounts) upon the later of the effective date of the B-Plan or the pilot's date of hire."

34.     Pursuant to Section 13, Part 3, of the Collective Bargaining Agreement, Continental will make such contributions to the B-Plan "as are required by the Plans and applicable law."

35.     The Collective Bargaining Agreement and the B-Plan itself do not specifically address how B-Plan contributions are to be calculated when a pilot is on military leave and, therefore, no interpretation of the Collective Bargaining Agreement or the B-Plan is necessary

5

when reviewing these calculations under USERRA.

36.     Pilots' longevity and hourly pay rates are not contested and are readily available on the Continental computer system and the pilots' pay display, which means that no interpretation of the Collective Bargaining Agreement is required in determining hourly pay.

37.     Continental's procedure for calculating B-Plan contributions for military leave is addressed in the Continental Pilot Bulletin dated March 13, 2007, hereby attached as Exhibit "A."

38.     In determining B-Plan contributions, for a short-notice leave, a pilot's Deemed Compensation is exact and should be calculated using the value of the schedule including the actual trip dropped.

39.     Although the pilot would lose the actual pay associated with a dropped trip, the scheduled time value of any dropped trip would provide an exact time value that can be used to calculate B-Plan contributions.  However, Continental does not use these exact time values, and thus does not contribute appropriate amounts to the B-Plans of employees utilizing the short notice procedure.

40.     This analysis and/or calculation requires no interpretation of the Collective Bargaining Agreement and the general terms of the Collective Bargaining Agreement regarding this issue are not in dispute.

41.     B-Plan calculations only require knowledge of a pilot's hourly pay rate, the hours assigned in a pilot's schedule and the percentage used to calculate the contribution as defined in Section 28, Part 4, Paragraph E of the Collective Bargaining Agreement.  These numbers are not in dispute and require no interpretation.

42.     Even though this calculation is simple and exact, Continental has failed to adequately and properly make these contributions to the B-Plan accounts of military members.

43.     If notice is provided by the pilot prior to the twelfth (12th) day of the preceding month, USERRA provides that B-Plan contributions should be calculated using the compensation that the pilot would have earned had the pilot not been on military leave and there should be no material difference in B-Plan contributions from month to month.

44.     Continental's current policy as illustrated in Exhibit "A" attached hereto is to review the average hours worked by the pilot during his or her last twelve (12) Active Status months ("12-month look-back") and use this number as the expected monthly earnings.

6

45.     The 12-month look-back is allowed under USERRA only if projected compensation is not reasonably ascertainable.  The 12-month look-back is almost exclusively used in other professions when compensation is based solely on commissions.

46.     The 12-month look-back may never provide an accurate assessment of what a pilot would have flown had the pilot not had military commitments because many pilots have military commitments every month, thereby permanently penalizing them based on their military service.

47.     During long term military absences, a pilot's projected compensation is easily ascertainable by multiplying their hourly pay rate by the hours awarded and/or flown by pilots with similar seniority who work full schedules.

48.     Continental pilots who are close in seniority and who work on the same equipment and in the same domicile are always scheduled within a few hours of each other as evidenced by Continental's own schedules.   Continental's efficient scheduling of its pilots thus allows for a reasonably ascertainable estimate of how many hours each military pilot would have flown.  USERRA mandates that this reasonably ascertainable estimate must be used when calculating B-Plan contributions rather than less accurate calculations derived from a 12-month look-back.

49.     The 12-month look-back does not take into account annual pay raises, upgrades in seats or equipment or the actual amount earned had the pilot not been on military leave.  This calculation process is in complete violation of USERRA.

50.     Upon information and belief, Continental has repeatedly and intentionally underpaid B-Plan contributions to pilots who are on military leave, thereby denying members of the Class a benefit of employment.

51.     USERRA requires employers to treat the period of military leave as service with the employer for purposes of vesting and the accrual of benefits.

52.     The Class' military service obligations are motivating factor in Continental's denial of the Class' B-Plan contributions.

C.      **Pattern Of Conduct By Continental Evidencing Membership In The United States Armed Services or National Guard As A Motivating Factor In Its Denial Of Benefits Of Employment To The Class**

53.     Plaintiffs and the Class they represent have been subject to Continental's continuous pattern of harassment in which Continental has repeatedly chided and derided

Plaintiffs for their military service through the use of discriminatory conduct and derogatory comments regarding their military service and military leave obligations.

54.     This wide-ranging pattern of harassment not only violates USERRA but shows a company-wide policy of discrimination that is not limited to the acts of a few employees acting on their own and shows that Continental's numerous USERRA violations are intentional.

55.     Continental's conduct includes placing onerous restrictions on taking military leave and by arbitrarily attempting to cancel military leave, in violation of USERRA.

56.     This harassment establishes that Plaintiffs' and the Class' membership in the United States Armed Services or the National Guard is a motivating factor in denying employment benefits to Plaintiffs and the Class.

57.     Plaintiffs are informed, believe and thereon allege that Continental has hired a disproportionately large number of non-military pilots when compared to the number of military pilots who applied for pilot positions.

58.     Plaintiffs are informed, believe and thereon allege that Gary D. Small (hereinafter "Small") is the Chief Pilot in Continental's Houston, Texas Office and has supervisory and managerial control over members of the Class.

59.     Plaintiffs are informed, believe and thereon allege that Steve Williams (hereinafter "Williams") is an Assistant Chief Pilot in Continental's Houston, Texas Office and has supervisory and managerial control over members of the Class.

60.     Plaintiffs are informed, believe and thereon allege that Lloyd Robeson (hereinafter "Robeson") is an Assistant Chief Pilot in Continental's Houston, Texas Office and has supervisory and managerial control over members of the Class.

61.     Plaintiffs are informed, believe and thereon allege that Kip Komidor (hereinafter "Komidor") is an Assistant Chief Pilot in Continental's Houston, Texas Office and has supervisory and managerial control over members of the Class.

62.     Plaintiffs are informed, believe and thereon allege that Thomas Pinardo (hereinafter "Pinardo") is an Assistant Chief Pilot in Continental's Houston, Texas Office and has supervisory and managerial control over members of the Class.

63.     Plaintiffs are informed, believe and thereon allege that Geoffrey Bender (hereinafter "Bender") is an Assistant Chief Pilot in Continental's Newark, New Jersey Office and has supervisory and managerial control over members of the Class.

64.     Plaintiffs are informed, believe and thereon allege that Robert Pulvino (hereinafter "Pulvino") is an Assistant Chief Pilot in Continental's Newark, New Jersey Office and has supervisory and managerial control over members of the Class.

65.     Plaintiffs are informed, believe and thereon allege that Andy Jost (hereinafter "Jost") is the Manager, International Flying in Continental's Newark, New Jersey Office and has supervisory and managerial control over members of the Class.

66.     Plaintiffs are informed, believe and thereon allege that Robert Duboise (hereinafter "Duboise") is a managerial employee in Continental's Newark, New Jersey Office and has supervisory and managerial control over members of the Class.

67.     Harassing comments by Continental and Continental management have been directed at named Plaintiffs and numerous class members and include:

    a.   Comments by Continental management, training and hiring personnel that the company should not hire military pilots due to the inconvenience placed on the airlines' ability to schedule;

    b.   Comments by Jost to members of the Class including, but not limited to:

        i.   "If you guys take more than three or four days a month of military leave, you're just taking advantage of the system".

        ii.   Statements that members of the Class should not be taking large blocks of military leave, that ten days a month was too long and that ninety-day deployments should stop.

        iii.   "We don't hire part time pilots. Their first commitment is to CAL."

        iv.   "I'm trying to run a business here, and if you're only available to me half the time, then I have to hire another half an employee to make up for you."

        v.   "I used to be a guard guy, so I know the scams you guys are running."

    c.   Comments by Bender to members of Class including but not limited to:

        i.   "Your commander can wait. You work full time for me.  Part time for him.  I need to speak with you, in person, to discuss your responsibilities here at Continental Airlines."

        ii.   "We don't hire part time pilots.  Their first commitment is to Continental Airlines."

    iii.   "Continental is your big boss, the Guard is your little boss";

    iv.   "You don't do anything but protect the state of Michigan against the Canadians" in response to a Michigan Air National Guardsman's request for military leave.

    v.   "Those Guard guys are scamming."

    vi.   "You take too much military leave,"

    vii.   "I didn't think the military did much over the holidays", in response to a pilot's military leave request in late December 2005;

d.   Comments by Pulvino regarding members of the Class including, but not limited to:

    i.   "The company was worried about possible staffing ramifications" for new military hires.

    ii.   That the pilot's military leave was "disapproved".

e.   Comments by Abbott regarding members of the Class, including but not limited to:

    i.   That for every 4 military pilots hired they need to hire and additional pilot to pick up their slack;

f.   Comments by Pinardo regarding members of the Class, including but not limited to:

    i.   "Continental is not happy with many military reservists right now. Short notice orders and short notice requests screw up their staffing formula and any short notice issues (in some cases 50 days notice) will throw a monkey wrench in PBS".

    ii.   "The military doesn't work on Thanksgiving" in response to a pilot's military leave notification the occurred during the Thanksgiving holiday.

g.   Comments by Williams regarding members of the Class, including but not limited to:

    i.   "You need to choose between CAL and the Navy".

h.   Comments by Continental management such as, "it's getting really difficult to hire you military guys because you're taking so much military leave".

10

i.   Statement to a pilot by Continental employee that "the reason we give you the RX day is to discourage you from taking short notice Mil leave".

j.   Threats by Continental to a member of the Class that he "may have to choose between the two jobs".

k.   Comments by Continental interviewers during pilot interviews suggesting that the applicant's affiliation with the military make it difficult for Continental to hire the applicant because he may have future military commitments.

l.   Comments by Continental interviewers during interviews suggesting that the schedules of current Continental employees who are affiliated with the military have made it difficult for Continental to hire new pilots who may have future military commitments.

68.   Harassing acts by Continental and Continental management have included:

a.   Chastising members of the Class for taking "short notice" military leave if pilots submit military leave notices after Continental's deadline for PBS;

b.   Yelling at a pilot for taking "short notice" military leave and threats by the Chief Pilot to call the pilot's squadron;

c.   Continental's refusal to approve a pilot's military leave request until after that pilot submitted his military orders;

d.   Continental's disapproval and denial of military leave notices;

e.   Harassing questions by Continental management regarding whether the requesting pilot's military leave is voluntary or involuntary;

f.   Continental's scheduling of an "off day" on a pilot's schedule rather than a military leave day despite the pilot's military service on that day;

g.   Continental's condescending attitude towards taking military leave including comments to a pilot that his check ride after his return from Iraq would be very difficult for him;

h.   Pressure to perform military service on days off;

i.   Phone calls to a pilots' home questioning the pilots about military leave;

j.   Questions during the interviewing process whether members of the Pilot Class intended to continue their military career; and

k.   Refusal to approve military leave until the submission of orders for military

11

leave less than 30 days.

69.     Continental ratified each and every action of harassment by refusing to act or even investigate complaints made by members of the Class.

70.     This anti-military environment caused and allows discriminatory hiring practices against military members.

71.     The specific acts perpetrated by Continental by and through its managerial employees including but not limited to Small, Williams, Robeson, Komidor, Pinardo, Bender, Pulvino, Jost, Duboise, and others, constituted a pattern and practice of intentional harassment related to the Class' service obligations and military affiliation.

72.     The Class' obligations and membership in the uniformed services was and is a motivating factor in all derogatory actions taken against the Plaintiffs' by Defendant.

**D.     Plaintiff Derek Carder's Experiences with Continental**

73.     Throughout the entirety of his employment with Continental, Plaintiff Carder has been a Lieutenant Commander in the Unites States Naval Reserve.

74.     Plaintiff Carder's Reserve Unit requires him to perform varying service obligations each month.

75.     Each month Plaintiff Carder provides reasonable notice regarding his military leave schedule when possible.

76.     From the start of his employment, Carder's supervisors, including but not limited to, Jost and Williams and Small, harassed and criticized Carder for his military service.

77.     Continental, through Williams, Jost, and Small, harassed Carder during his tenure at Continental.  Harassing acts included:

        a.  Williams repeatedly demanding that Plaintiff Carder provide military orders prior to Plaintiff Carder performing his service obligations to justify Plaintiff Carder's military leave;

        b.  Williams repeatedly calling Plaintiff Carder's Command to verify the timing and purpose of his military leave absences;

        c.  Jost sending a letter to Plaintiff Carder on or around December 18, 2007, informing Carder that his probationary status was being extended for thirty (30) days to allow an investigation into his military service;

        d.  Williams requiring Plaintiff Carder via letter on January 8, 2009 to meet with

12

him on, January 21, 2008, his day off, "to attend an investigatory meeting in the office of the Chief Pilot...to discuss [his] use of Military leave during the December 2007 bid period";

e.  Small repeatedly contacting Plaintiff Carder's Command to verify and discourage Carder's military leave requests, making comments, such as "What we ARE looking for is support by the military command to discourage the use of military leave as 'fairy dust' as a tactical schedule improvement tool by some pilots."

f.  Small directly and wrongly accusing Plaintiff Carder of submitting a fraudulent military leave notification;

g.  Small directly and publicly accusing Plaintiff Carder in an email to over fifty (50) Chief Pilots from other airlines of fraudulently submitting dates for military leave;

h.  Small contacting the Chief of Naval Air Training at the Department of the Navy concerning Plaintiff Carder's military leave notification, who later confirmed, "Once again, our investigation found no inappropriate use or abuse of military leave in LCDR Carder's case."

i.  Repeated counseling from Williams, Small and Jost for submitting "short notice" military leave requests; and

j.  Continental management repeatedly forcing Plaintiff Carder to submit military leave orders for military leave periods of less than thirty days.

78.  When Plaintiff Carder does not have military commitments during a given month, he is awarded, through PBS, lines of flying commensurate with his relative seniority.

79.  A normal line of flying would provide single or multi-day trips to certain locations, a certain number of flying hours based on each trip and certain days off.

80.  Military leave requirements are generally based on the operational commitments of the military unit and reserve and guard members have very little if any control in being able to select certain days to perform military duties.

81.  When Plaintiff Carder submits a multi-day block of military leave prior to the twelfth (12th) of each month, Continental constructs Plaintiff Carder's schedule through PBS with lower quality trips that include fewer flight hours, corresponding to less pay, with fewer

13

days off and with days of the week off that he might otherwise would have been able to work.

82.     Continental therefore requires Plaintiff Carder to make up days of work that Plaintiff Carder otherwise would have had off.

83.     When Plaintiff Carder submits military leave after the twelfth of each month, Continental intimidates and discourages Plaintiff Carder from taking military leave, even though Plaintiff Carder usually has no or very little control in being able to select his days of military leave.

84.     During months when Plaintiff Carder is not on military leave, Continental contributes an amount to Plaintiff Carder's B-Plan that is based on a percentage of the amount he is paid for the entire month and is substantially more than what he receives when he is on military leave.

85.     During months when Plaintiff Carder is in on military leave for some portion of the month, Continental contributes to his B-Plan an amount that is substantially less than the amount he would have received had he not been on military leave.

86.     Plaintiff Carder's military service was a motivating factor in Continental's denial of this benefit of his employment.

**E.     Plaintiff Mark Bolleter's Experiences with Continental**

87.     Continental has employed Plaintiff Bolleter as a pilot since on or around February 15, 1998.  When Plaintiff Bolleter began his employment at Continental, he served as an Intelligence Officer in the Louisiana Air National Guard and subsequently served in the Texas Air National Guard and the United States Air Force Reserve.

88.     Plaintiff Bolleter's military units required him to perform varying service obligations each month.

89.     Each month Plaintiff Bolleter provided reasonable notice regarding his military leave schedule when possible.

90.     When Plaintiff Bolleter submitted military leave after the twelfth (12th) of each month, Continental intimidated and discouraged Plaintiff Bolleter from taking military leave, even though Plaintiff Bolleter usually has no or very little control in being able to select his days of military leave.

91.     In or around June 2007, Plaintiff Bolleter retired from the Louisiana Air National Guard.

92.    Prior to retiring from the Air National Guard, Plaintiff Bolleter was a "Reserve Pilot" at Continental.

93.    A Reserve Pilot is a pilot who is awarded a Reserve Line, with a schedule for a bid period consisting of Reserve Days and Off Days.

94.    When Plaintiff Bolleter submitted military leave prior to the twelfth (12th) of the bid month, PBS would schedule his days off on days that he otherwise would have been scheduled to work based on his seniority, which caused him to work for Continental on days that he would otherwise would be able to have off and which caused him to perform his military obligations on his days off from Continental.

95.    Even when Plaintiff Bolleter intentionally performed his service obligations on his scheduled days off, due to PBS formulas, Plaintiff Bolleter would receive less pay than non-military Reserve Pilots.

96.    During months when Plaintiff Bolleter was not on military leave, Continental contributed an amount to Plaintiff Bolleter's B-Plan that was based on a percentage of the amount he is paid for the entire month and was substantially more than what he received when he was on military leave.

97.    During months when Plaintiff Bolleter was on military leave for some portion of the month, Continental contributed to his B-Plan an amount that was substantially less than the amount he would have received had he not been on military leave.

98.    Plaintiff Bolleter's military service was a motivating factor in Continental's denial of this benefit of his employment.

**F.    Plaintiff Drew Daugherty's Experiences with Continental**

99.    Continental has employed Plaintiff Daugherty as a pilot since on or around March 2001.  Plaintiff Daugherty began his employment at Continental while he was a Captain in the Texas Air National Guard and he is currently serving in the Texas Air National Guard as a Lieutenant Colonel.

100.    Plaintiff Daugherty's Texas Air National Guard Unit requires him to perform varying service obligations each month.

101.    Each month Plaintiff Daugherty provides reasonable notice regarding his military leave schedule when possible.

102.    When Plaintiff Daugherty does not have military commitments during a given

month, he is awarded, through PBS, lines of flying commensurate with his relative seniority.

103.    A normal line of flying would provide single or multi-day trips to certain locations, a certain number of flying hours based on each trip and certain days off.

104.    Military leave requirements are generally based on the operational commitments of the military unit and reserve and guard members have very little if any control in being able to select certain days to perform military duties.

105.    When Plaintiff Daugherty submits military leave after the twelfth (12th) of each month, Continental intimidates and discourages Plaintiff Daugherty from taking military leave, even though Plaintiff Daugherty usually has no or very little control in being able to select his days of military leave.

106.    When Plaintiff Daugherty submits military leave prior to the twelfth of the bid month, PBS schedules his days off on days that he otherwise would have been scheduled to work based on his seniority, which causes him to work for Continental on days that he otherwise would be able to have off and which causes him to perform his military obligations on his days off from Continental.

107.    When Plaintiff Daugherty submits a multi-day block of military leave prior to the twelfth of each month, Continental constructs Plaintiff Daugherty's schedule through PBS with lower quality trips that include fewer flight hours, corresponding to less pay, with fewer days off and with days of the week off that he might otherwise would have been able to work.

108.    Continental requires Plaintiff Daugherty to attempt to make up days of work on days Plaintiff Daugherty otherwise would have had off thereby penalizing him for having military commitments.

109.    During months when Plaintiff Daugherty is not on military leave, Continental contributes an amount to Plaintiff Daugherty's B-Plan that is based on a percentage of the amount he is paid for the entire month and is substantially more than what he receives when he is on military leave.

110.    During months when Plaintiff Daugherty is in on military leave for some portion of the month, Continental contributes to his B-Plan an amount that is substantially less than the amount he would have received had he not been on military leave.

111.    Plaintiff Daugherty's military service is a motivating factor in Continental's denial of this benefit of his employment.

16

G.    **Plaintiff Andrew Kissinger's Experiences with Continental**

112.    Plaintiff Kissinger applied for a position at Continental and received an interview with Continental on March 29, 2006.

113.    At the time of the interview, Plaintiff Kissinger was a Major in the United States Air Force Reserves.

114.    During the interview, Plaintiff Kissinger was asked about his military reserve commitments and how he would be able to fulfill both his military commitments and his potential Continental commitments.

115.    During the interview, Plaintiff Kissinger was informed by an interviewer that due to the scheduling conflicts of some current Continental employees with those employees' military commitments, it was going to be extremely difficult for Continental to hire new employees who are members of the military reserves and National Guard.

116.    Upon information and belief, Plaintiff Kissinger was not hired by Continental due to his military commitments.

117.    Plaintiff Kissinger's military service was a motivating factor in Continental's denial of his employment.

118.    Continental therefore penalized Plaintiff Kissinger for being affiliated with the United States Air Force Reserves.

119.    Due to Plaintiff Kissinger's military obligations, he was refused employment by Continental.

## V.

## CLASS ACTION ALLEGATIONS

120.    Plaintiffs bring this action on behalf of themselves and all others similarly situated, as a class action pursuant to Rule 23(a) and 23(b)(1)-23(b)(2) of the Federal Rules of Civil Procedure.  The nationwide class which Plaintiffs seek to represent is composed of and defined as follows (hereinafter the "Class"):

> All past and present employees and/or employee applicants of Continental who are or were members of the United States Armed Services or National Guard.

121.    Plaintiffs Carder, Bolleter and Daugherty seek to represent the following subclass (hereinafter the "Employee Subclass"):

All past and present employees of Continental who are or were members of the United States Armed Services or National Guard and who have taken military leave between January 1, 1994 and the present while employed by Continental.

122.   Plaintiff Kissinger seeks to represent the following subclass (hereinafter the "Applicant Subclass"):

All those individuals who applied for employment at Continental from January 1, 1994 to the present who were not hired due to their military affiliations and/or commitments.

123.   <u>Numerosity</u> (Fed R. Civ. P. 23(a)(1)): The Class and Subclasses are so numerous that joinder of all individual members in one action is impracticable and unfeasible.  The disposition of their claims through this action will benefit both the parties and this Court.

124.   Plaintiffs are informed and believe and thereon allege that the Class and Subclasses consists of, at a minimum, 100 individual members.

125.   The exact size of the Class and Subclasses are ascertainable through Defendant's records, including, but not limited to, Defendant's employment and human resources records.

126.   Members of the Class and Subclasses may be notified of the pendency of this action by techniques and forms commonly used in class actions, such as by first class mail, email notice, website notice, or combinations thereof, or by other methods suitable to this class and deemed necessary and/or appropriate by the Court.

127.   <u>Typicality</u> (Fed. R. Civ. P. 23(a)(3)): Plaintiffs Carder's, Bolleter's and Daugherty's claims are typical of the claims of the Class and Employee Subclass.  Plaintiff Kissinger's claims are typical of the claims of the Class and Applicant Subclass.  The claims of Plaintiffs and members of the Class and the respective Subclasses are based on the same legal theories and arise from the same unlawful conduct.

128.   Plaintiffs and members of the Class and Subclasses are or were employees or employee applicants of Defendant and are or have served in the United States Armed Services or United States National Guard.

129.   <u>Common Questions of Fact and Law</u> (Fed. R. Civ. P. 23(a)(2) and b(3)): There is a well-defined community of interest and common questions of fact and law affecting the members of the Class and the respective Subclasses.

130.   The questions of law and fact common to the Class and the respective Subclasses predominate over questions affecting only individual members of the Class and the respective

Subclasses and include the following, without limitation:

    a.   Whether Defendant's retirement contribution policies and procedures (hereinafter "B-Plan contributions") discriminate against the Class on the basis of their military service obligations;

    b.   Whether Defendant has harassed and discriminated against the Class due to their service and/or affiliation with the United States Armed Services or National Guard, by including, but not limited to, denying military leave, discouraging military leave, and making derogatory comments to and about the Class for their United States Armed Services or National Guard affiliation and service obligations;

    c.   Whether Defendant's acts, practices, policies and procedures have violated USERRA by denying benefits of employment and/or discriminating against and/or harassing members of the Class and Subclasses;

    d.   Whether Defendant's acts, practices and policies and procedures have violated USERRA by denying employment to members of the Applicant Subclass.

    e.   Whether Defendant's conduct, as set forth herein, injured members of the Class and Subclasses;

    f.   Whether injunctive and other equitable remedies for the Class and Subclasses are warranted, and;

    g.   Whether members of the Class and Subclasses are entitled to damages, including recovery of costs and/or reasonable attorneys' fees based on Defendant's conduct as alleged herein.

131.   <u>Adequacy of Representation</u> (Fed. R. Civ. P. 23(a)(4)): Plaintiffs are adequate representatives of the Class and respective Subclasses because their interests do not conflict with the interests of the Class or Subclasses which Plaintiffs seek to represent. Plaintiffs will fairly, adequately, and vigorously represent and protect the interests of the Class and Subclasses through their attorneys and have no interests antagonistic to the Class or Subclasses. Plaintiffs have retained adequate counsel who have substantial experience and success in the prosecution of class actions and complex business litigation matters.

132.   <u>Superiority</u> (Fed. R. Civ. P. 23(s)(1) and 23(b)(3)): The nature of this action and the nature of the laws available to the Class and Subclasses make use of the class action format a

particularly efficient and appropriate procedure to afford relief to the Class and Subclasses for the wrongs alleged. Further, this case involves a large corporate employer and a large number of individual employees and employee applicants (Plaintiffs and the members of the Class and Subclasses) with many relatively small claims with common issues of law and fact. If each employee or employee applicant was required to file an individual lawsuit, Defendant would necessarily gain an unconscionable advantage since they would be able to exploit and overwhelm the limited resources of each individual Plaintiff with their vastly superior financial and legal resources. As a result, the expense and burden of individual litigation makes it economically infeasible and procedurally impracticable for each member of the Class and/or Subclasses to individually seek redress for the wrongs done to them. Requiring each member of the Class and/or Subclasses to pursue an individual remedy would also discourage the assertion of lawful claims by employees who would be disinclined to pursue an action against their present and/or former employer for an appreciable and justifiable fear of retaliation and permanent damage to their careers at their present and/or subsequent employment. Proof of common business practice or factual pattern, of which the named Plaintiffs experienced, is representative of the Class and Subclasses and will establish the right of each Class and/or Subclass Member to recovery on the causes of action alleged.

133.    The likelihood of individual Class and/or Subclass members prosecuting separate claims is remote. The prosecution of separate actions by the individual Class and/or Subclass Members, even if possible, would create a substantial risk of inconsistent, contradictory or varying verdicts or adjudications with respect to the individual Class and/or Subclass Members against Defendants, and would establish potentially incompatible standards of conduct for Defendants and/or legal determinations with respect to individual Class and/or Subclass Members which would, as a practical matter, be dispositive of the interest of other Class and/or Subclass Members not parties to the adjudications or which would substantially impair or impede the ability of the class members to protect their interests. Individualized litigation would also increase the delay and expense to all parties and the court system resulting from multiple trials of the same factual issues. In contrast, the conduct of this matter as a class action presents fewer management difficulties, conserves resources of the parties and the court system, and would protect the rights of each member of the Class and respective Subclasses. Further, the claims of the individual Class and Subclass Members are not sufficiently large to warrant

vigorous prosecution considering all of the concomitant costs and expenses attending thereto. Plaintiffs know of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action.

134.    Class certification is appropriate pursuant to Fed. R. Civ. Proc. Rule 23(b)(2) because Continental Airlines has acted on grounds generally applicable to the Class, making appropriate compensatory, declaratory and injunctive relief to Plaintiffs and the Class as a whole. The Class and Subclass members are entitled to compensatory, declaratory and injunctive relief to end Defendant's acts and practices that have denied members of the Class and Employee Subclass certain benefits of their employment and have denied members of the Applicant Subclass employment.

## VI.

### FIRST CAUSE OF ACTION FOR VIOLATIONS OF THE UNIFORMED SERVICES EMPLOYMENT AND REEMPLOYMENT RIGHTS ACT OF 1994 §2(A), 38 U.S.C. §§4311, 4323

(On Behalf of Plaintiffs Carder, Bolleter, Daugherty and the Employee Subclass as Against All Defendants)

135.    Plaintiffs re-allege and incorporate herein by reference each and every allegation contained within paragraphs 1 through 134, inclusive, as though set forth at length herein and made a part hereof.

136.    Plaintiffs, the Employee Subclasses they represent are persons protected under the Uniformed Services Employment and Reemployment Rights Act of 1994 ("USERRA") §2(a), 38 U.S.C. §§4301-4333.

137.    Continental violated USERRA by depriving Plaintiffs, members of the Employee Subclass employment benefits through the discriminatory practices in the underpayment of B-Plan retirement contributions.

138.    The Class' military service is a motivating factor in Continental's denial of these benefits of employment.

139.    Continental has repeatedly underpaid B-Plan contributions to pilots who are on Military Leave, thereby denying Plaintiffs members of the Employee Subclass a benefit of employment.

140.    Continental's procedure for calculating B-Plan contributions results in a reduction in contributions to pilots' B-Plan thereby denying Plaintiffs members of the Employee Subclass

21

a benefit of their employment.

141.   USERRA requires employers to treat the period of military leave as service with the employer for purposes of vesting and the accrual of pension benefits.  Pension benefits should accrue as though the employees were available but for the military service.

142.   By repeatedly discriminating against Plaintiffs and the Employee Subclass through the underpayment of their B-Plain retirement contributions, Continental violated §4311 of USERRA.

143.   Plaintiffs' and the Employee Subclass' service obligations were a motivating factor in the discriminatory actions taken against Plaintiffs and the Employee Subclass by Continental.

## VII.

### SECOND CAUSE OF ACTION FOR VIOLATIONS OF THE UNIFORMED SERVICES EMPLOYMENT AND REEMPLOYMENT RIGHTS ACT OF 1994 §2(A), 38 U.S.C. §§4311, 4323

### (On Behalf of Plaintiff Kissinger and the Applicant Subclass as Against All Defendants)

144.   Plaintiffs re-allege and incorporate herein by reference each and every allegation contained within paragraphs 1 through 143, inclusive, as though set forth at length herein and made a part hereof.

145.   Plaintiff Kissinger and the Applicant Subclass he represents are persons protected under the Uniformed Services Employment and Reemployment Rights Act of 1994 ("USERRA") §2(a), 38 U.S.C. §§4301-4333.

146.   Continental has violated USERRA by denying employment to the Applicant Subclass based on their military service.

147.   Upon information and belief, Continental has repeatedly made comments to members of the Applicant Subclass during the pilot application process indicating that the applicant's affiliation with the military made it difficult for Continental to hire the applicant because the individual may have future military commitments.

148.   Upon information and belief, Continental has repeatedly refused to hire members of the Applicant Subclass because they may have future military obligations.

149.   USERRA requires employers to treat all applicants for employment similarly regardless of their military service affiliation and obligations.

150.    By repeatedly discriminating against Plaintiff Kissinger and the Applicant Subclass through their refusal to hire members of the Applicant Subclass, Continental violated §4311 of USERRA.

151.    Plaintiff Kissinger's and the Applicant Subclass' service obligations were a motivating factor in the Continental's refusal to hire and similar discriminatory actions taken against Plaintiff Kissinger and the Applicant Subclass by Continental.

## X.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the members of the Class and respective Subclasses, pray for judgment against Continental, its officers, agents, employees, successors and all persons in active concert or participation with it as follows:

1.    Determine that this action may proceed and be maintained as a class action, designating Plaintiffs as Lead Plaintiffs, and certifying Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure and their counsel as lead counsel, and designating Plaintiffs as representatives of the class and their counsel of record as Class Counsel;

2.    Declare that the acts and practices complained of herein are unlawful and are in violation of USERRA, 38 U.S.C. § 4301, et.seq.;

3.    Require that Continental fully comply with the provisions of USERRA by providing Plaintiffs and Class Members all employment benefits denied them as a result of the unlawful acts and practices under USERRA described herein, including, but not limited to, lost B-Plan contributions, lost earned vacation time, lost earned sick leave (or the monetary equivalent), pay lost due to the inability to bid on flights commensurate with their levels of seniority, lost pay due to not being hired, lost employment and lost seniority;

4.    Enjoin Continental from taking any action against Plaintiffs and members of the Class that fails to comply with the provisions of USERRA;

5.    Award Plaintiffs prejudgment interest on the amount of lost wages or employment benefits found due;

6.    Order that Continental pay liquidated damages in an amount equal to the amount of lost compensation and other benefits suffered by reason of Continental's willful violations of USERRA;

23

7.    Award special damages to Plaintiffs and each member of the Class and respective Subclasses according to proof at trial;

8.    Award general damages to Plaintiffs and each member of the Class and respective Subclasses according to proof at trial;

9.    Award reasonable attorneys' fees and costs to Class Counsel; and

10.    Grant such other and further relief as may be just and proper and which Plaintiffs may be entitled to under all applicable laws.


Dated:  December 11, 2009        Respectfully Submitted,

By: /s/  Brian Lawler


Brian J. Lawler, CA #22148, Admitted Pro Hac Vice
Pilot Law, P.C.
101 W. Broadway, Suite 1050
San Diego, CA 92101
(619) 255-2884 (Phone)
(619) 231-4984 (Fax)

**ATTORNEY-IN-CHARGE FOR PLAINTIFFS AND THE CLASS**

Of-Counsel:
Alexandra G. Taylor, CA #253963, Admitted Pro Hac Vice
Pilot Law, P.C.
101 W. Broadway, Suite 1050
San Diego, CA 92101
(619) 255-2884 (Phone)
(619) 231-4984 (Fax)

Charles M. Billy, CA #247046, Admitted Pro Hac Vice
The Law Offices of Charles M. Billy, A Professional Corporation
22706 Aspan Street, Suite 305
Lake Forest, CA 92630
(949) 357-9636 (Phone)
(949) 341-4542 (Fax)

Gene J. Stonebarger, CA # 209461, Admitted Pro Hac Vice
Lindsay & Stonebarger, A Professional Corporation
620 Coolidge Drive, Suite 225
Folsom, CA 95630
 (916) 294-0002 (Phone)
(916) 294-0012 (Fax)

24

## <u>JURY DEMAND</u>

Plaintiffs hereby demand a trial by jury.

Dated:  December 11, 2009        Respectfully Requested,


By: /s/  Brian Lawler


Brian J. Lawler, CA #22148, Admitted Pro Hac Vice
Pilot Law, P.C.
101 W. Broadway, Suite 1050
San Diego, CA 92101
(619) 255-2884 (Phone)
(619) 231-4984 (Fax)

### ATTORNEY-IN-CHARGE FOR PLAINTIFFS AND THE CLASS

Of-Counsel:
Alexandra G. Taylor, CA #253963, Admitted Pro Hac Vice
Pilot Law, P.C.
101 W. Broadway, Suite 1050
San Diego, CA 92101
(619) 255-2884 (Phone)
(619) 231-4984 (Fax)

Charles M. Billy, CA #247046, Admitted Pro Hac Vice
The Law Offices of Charles M. Billy, A Professional Corporation
22706 Aspan Street, Suite 305
Lake Forest, CA 92630
(949) 357-9636 (Phone)
(949) 341-4542 (Fax)

Gene J. Stonebarger, CA # 209461, Admitted Pro Hac Vice
Lindsay & Stonebarger, A Professional Corporation
620 Coolidge Drive, Suite 225
Folsom, CA 95630
 (916) 294-0002 (Phone)
(916) 294-0012 (Fax)

## CERTIFICATE OF SERVICE

I, Brian J. Lawler, an attorney, hereby certify that on December 11, 2009, I electronically transmitted the foregoing Plaintiffs' First Amended Complaint to the Clerk's Office using the ECF System for filing and transmittal of a Notice of Electronic filing and to the following ECF registrants:

Jeffrey C. Londa
Ogletree, Deakins, Nash, Smoak & Stewart, P.C
500 Dallas Street, Suite 3000
Houston, TX 77002
Telephone (713) 655-5750
Facsimile (713) 655-0020
Jeffrey.Londa@ogletreedeakins.com

/s/ Brian J. Lawler
BRIAN J. LAWLER, ESQ.